Raul Antonio **FELAN**, Appellant,

v.

The **STATE** of Texas, State.

No. 2–00–013–CR.

Court of Appeals of Texas,
Fort Worth.

April 12, 2001.

Rehearing Overruled May 17, 2001.

Suzanne Hudson, Arlington, for Appellant.

Tim Curry, Crim. Dist. Atty., Charles M. Mallin, Chief Appellate Section, Donald J. Piller, Bret Helmer, Mark Theilman, Asst. Dist. Attys., Fort Worth, for Appellee.

Panel B: LIVINGSTON, HOLMAN, and GARDNER, JJ.

## OPINION

GARDNER, Justice.

### I. Introduction

Appellant Raul Antonio Felan appeals his conviction for aggravated sexual assault of J.L., a child under the age of 14. Appellant contends that the trial court erred by excluding relevant impeachment evidence and by denying his motion for continuance. Appellant further contends the jury charge on punishment contained a misstatement of the law regarding the award of parole and good conduct time. We affirm.

### II. Factual Background

The undisputed evidence presented at the guilt and innocence phase of Appellant's trial established the following events:

When she first met Appellant at a local park in the fall of 1997, J.L., the victim, was 13 years old and was in the seventh grade. Appellant was 28 years old at the time and lived with his mother. Upon meeting, both Appellant and J.L. lied to each other about their ages—J.L. told Appellant that she was 16 years old, and Appellant told J.L. that he was 20 or 21 years old. Appellant also gave J.L. a false name, telling her that his name was "Tony Camacho ." That very same day, Appellant and J.L. went for a drive in Appellant's truck and, after consuming alcohol,[1] had sexual intercourse. J.L. began to see Appellant two or three times a week. They

---

1. J.L. testified that she was intoxicated at the time.

usually drove around in Appellant's truck. In addition to engaging in sexual intercourse and other sexual acts on numerous occasions, they got high on marijuana, speed, and acid, which Appellant supplied. J.L. testified that, before she met Appellant, she had never consumed alcohol and had never been high on marijuana or acid. Sometimes they had sex in Appellant's truck, and other times they went to motels or to Appellant's house when his mother was at work. J.L. kept her relationship with Appellant secret from her parents, but her sister, Blanca, and her friends were aware that J.L. was seeing Appellant on a frequent basis.

J.L. considered Appellant to be her boyfriend, and their relationship continued into February of 1998. In February, J.L. was "shocked" and felt "stupid" when Appellant told her that he had a daughter in the sixth grade. On February 15, 1998, J.L. was further disillusioned when one of Appellant's friends revealed to her that Appellant was not 20 years old, but really 28 years old, and that his real name was not "Tony Camacho," but actually Raul Felan. The affair finally ended on February 16, 1998, when J.L. was arrested and placed in the Dallas County Juvenile Detention Center because she threatened her sister, Blanca, for making a derogatory comment about Appellant. .

On February 27, 1998, pursuant to an investigation involving another teenage girl's allegations about Appellant, Arlington Police Detective James Sumrall interviewed J.L. at the Dallas Juvenile Detention Center. During the course of the interview, J.L. provided Sumrall with details of her affair with Appellant.

Appellant was subsequently charged by a three-count indictment for sexual assault of J.L., a child under the age of 14. Hav-

ing an extensive criminal history, Appellant's indictment also included a habitual offender allegation and an enhancement paragraph.[2]

After pleading not guilty to all charges against him, Appellant was found guilty by the jury. Appellant entered a plea of "true" to the habitual offender allegation and stipulated to his prior convictions, after which the jury sentenced him to 60 years' confinement.

## III. DISCUSSION

### A. Exclusion of Impeachment Evidence Regarding Complainant's Bias

In his first issue, Appellant asserts a due process violation of his right to confront the complainant when the trial court prevented Appellant from introducing allegedly relevant impeachment evidence regarding the victim. Specifically, Appellant complains that the trial court erred by excluding evidence that he claims would have shown that J.L. was willing to lie to authorities and would have demonstrated her bias or animus against him.

#### 1. Appellant's Proffered Evidence

Appellant attempted to introduce evidence that the police contacted J.L. while investigating allegations that Appellant was involved with another teenage girl, V.R. V.R. had alleged she "possibly had been drugged and sexually abused" by Appellant at a motel, and that J.L. was present on that occasion. Charges were filed against Appellant in connection with V.R.'s allegations.

The trial court conducted a hearing outside the presence of the jury to determine the admissibility of this evidence. In the ensuing voir dire examination of Detective Sumrall, Appellant elicited testimony about J.L.'s statement to the police re-

---

**2.** The enhancement paragraph was waived by the State.

garding V.R.'s claim that, while Appellant had sexual relations with her, J.L. was present. According to Detective Sumrall's testimony, J.L. made the following statement to the police:

> I know [V.R.]. I have heard what [V.R.] has said. I have never been to a motel with [V.R.] She is a liar. I do not like her because she loves Tony [Appellant]. She is not to be with my man. I have told her to stay away from him.

Further, in an attempt to place J.L.'s credibility at issue by showing that Sumrall did not believe J.L.'s statement, Appellant elicited the following testimony:

Q. Right. When you received the information from [J.L.] contained in this statement that [V.R.] was not at the Fiesta Motel, one of two things has to be true. Number one, either [V.R.'s] lying when she says she was at the hotel, or [J.L.] is lying saying that she wasn't. Isn't that a fair deduction?

A. That is a fair deduction, yes.

Q. And if you thought that [J.L.] was being truthful with you when she said that [V.R.] was not at the motel, you would not have filed the [V.R.] case, would you?

A. Can you repeat the question? I want to make sure I'm understanding.

Q. Sure. Okay. If you had believed at the time you took this statement from [J.L.] that her statement to you that [V.R.] was not at the motel—that's what she told you, she wasn't there?

A. Uh-huh.

Q. If you believed that, then you would not have filed a case against [V.R.], would you? I mean against Tony [Appellant] on [V.R.]?

A. It was a separate case, and I used each case on its own merit from the victim's statements.

Q. But at least you had conflicting statements?

A. Correct.

Q. One of which is [V.R.] saying, "I woke up nude with this man," and one from [J.L.] saying she never was there?

A. Correct.

Q. Now, somebody's wrong, right, obviously?

A. Fair deduction again.

Q. Okay, thank you.

Appellant argued to the trial court that Detective Sumrall's testimony about the [V.R.] investigation, including the victim's statement to him, established that J.L. had an animus toward Appellant, that "she's lying all over the place," and that "the business of this is just one more in a series of a long line of lies that [J.L.] tells people in authority." The State objected to the introduction of this evidence on several grounds, including relevance and potential for prejudice. The trial court sustained the State's objection by stating that, although "the probative value is not outweighed by the prejudicial effect," the evidence "is not relevant at this time."

On appeal, Appellant contends that this evidence was admissible (1) to impeach J.L.'s general credibility and (2) to show bias, animus, or motive to lie in this particular case. We hold that the trial court did not abuse its discretion by ruling that it was not admissible on either ground.

### 2. Standard of Review

As an appellate court, we review the trial court's decision to admit or exclude evidence under an abuse of discretion standard. *See Green v. State*, 934 S.W.2d 92, 101–02 (Tex.Crim.App.1996); *Montgomery v. State*, 810 S.W.2d 372, 379–80 (Tex.Crim.App.1990); *Couchman v. State*, 3 S.W.3d 155, 158 (Tex.App.—Fort Worth 1999, pet. ref'd). Therefore, we will not reverse a trial court as long as its

ruling was within the "zone of reasonable disagreement." *Green,* 934 S.W.2d at 102; *Montgomery,* 810 S.W.2d at 391; *Couchman,* 3 S.W.3d at 158. Moreover, if the trial court's ruling on the admission of evidence is correct under any theory of law, even if the trial court gives the wrong reason for its ruling, we must affirm the court's decision to admit the evidence. *Romero v. State,* 800 S.W.2d 539, 543 (Tex. Crim.App.1990); *Couchman,* 3 S.W.3d at 158; *Pettigrew v. State,* 908 S.W.2d 563, 568 (Tex.App.—Fort Worth 1995, pet. ref'd).

■■■ "Great latitude should be allowed the accused in showing any fact that would tend to establish ill feeling, bias, motive, and animus on the part of any witness testifying against [him]." *Recer v. State,* 821 S.W.2d 715, 717 (Tex.App.—Houston [14th Dist.] 1991, no pet.); *see also, Lagrone v. State,* 942 S.W.2d 602, 613 (Tex. Crim.App.1997); *McDaniel v. State,* 3 S.W.3d 176, 180 (Tex.App.—Fort Worth 1999, pet. ref'd); *Gonzales v. State,* 929 S.W.2d 546, 549 (Tex.App.—Austin 1996, pet. ref'd). However, the trial court has considerable discretion in determining how and when bias may be proved, and what collateral evidence is material for that purpose. *Recer,* 821 S.W.2d at 717 (citing *Green v. State,* 676 S.W.2d 359, 363 (Tex. Crim.App.1984)). The court may properly limit the scope of cross-examination to avoid harassment, prejudice, confusion of the issues, endangering the witness, and the injection of cumulative or collateral evidence. *Lagrone,* 942 S.W.2d at 613; *Roberts v. State,* 963 S.W.2d 894, 901 (Tex. App.—Texarkana 1998, no pet.). Thus, the trial court exceeds its discretion only when it prohibits a defendant from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness. *Lagrone,* 942 S.W.2d at 613.

### 3. Application

■■ First of all, this evidence was not admissible to impeach J.L.'s general credibility. Rule 608 of the Texas Rules of Evidence governs the admissibility of evidence aimed at impeaching a witness's credibility. Tex.R.Evid. 608; *Dixon v. State,* 2 S.W.3d 263, 272 (Tex.Crim.App. 1998) (op. on reh'g). Rule 608(a) permits two types of general credibility impeachment of a witness-testimony that the witness has a poor reputation in the community for telling the truth, and testimony from a specific character witness that, in his opinion, the fact witness is not worthy of belief because they generally do not tell the truth. Tex.R.Evid. 608(a); *Dixon,* 2 S.W.3d at 272. Detective Sumrall's testimony does not fall into either of these categories.

Sumrall's testimony was evidence of a specific instance of conduct—that J.L. did not tell the truth on a specific occasion. Rule 608(b) expressly prohibits the use of specific instances of conduct to impeach a witness's credibility except to expose bias or interest, to rebut affirmative representations made on direct examination, or to demonstrate a lack of capacity. *Tinlin v. State,* 983 S.W.2d 65, 69 (Tex.App.—Fort Worth 1998, pet. ref'd) (citing *Lagrone,* 942 S.W.2d at 612–13). Consequently, to the extent Appellant's proffer was aimed at attacking J.L.'s general credibility, it was properly excluded as an inadmissible specific instance of untruthful conduct.

■■ The evidence was likewise inadmissible to show animus or bias. Appellant had the burden of showing that the excluded evidence was relevant to the issue of bias. *Chambers v. State,* 866 S.W.2d 9, 26–27 (Tex.Crim.App.1993). In her statement, J.L. merely stated that V.R. loved Appellant and that V.R. was a liar. We believe J.L.'s statement wholly fails to

show animus or bias against Appellant, and could only be fairly read to show animus toward V.R. J.L.'s bias or animus towards V.R. was a collateral issue and had no bearing on her motive to testify falsely against Appellant.

The trial court did not abuse its discretion by excluding Appellant's proffered evidence as irrelevant. Rule 401 of the Texas Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." TEX.R.EVID. 401. The Court of Criminal Appeals has held that, for a particular piece of evidence to be relevant, it should be "helpful in determining the truth or falsity of any fact that is of consequence to the lawsuit." *Montgomery*, 810 S.W.2d at 376. Appellant's proffered evidence does not meet these qualifications.

For the above reasons, we hold the trial court acted well within its discretion in excluding Appellant's proffered evidence. We overrule Appellant's first point.

### B. Denial of Appellant's Motion for Continuance

In his second issue, Appellant contends that the trial court erred in denying his oral motion for continuance. Appellant called Rene Davila as his final defense witness. When she failed to appear, Appellant orally moved for a continuance until 9:00 the following morning. The trial court denied the motion. Appellant now argues that the denial of the motion for continuance denied him due process under the laws of the United States and Texas.[3]

Appellant has not preserved error for this point. Article 29.03 of the Texas Code of Criminal Procedure requires that a motion for continuance be in writing. TEX.CODE CRIM.PROC.ANN. art. 29.03 (Vernon 1989). In accordance with this rule, this court, as well as the Court of Criminal Appeals, has explicitly held that a trial court's denial of an unsworn, unwritten motion for continuance presents nothing for appellate review. *Dewberry v. State*, 4 S.W.3d 735, 756 (Tex.Crim.App.1999), *cert. denied*, 529 U.S. 1131, 120 S.Ct. 2008, 146 L.Ed.2d 958 (2000); *Rodda v. State*, 926 S.W.2d 375, 376 (Tex.App.—Fort Worth 1996, pet. ref'd). We overrule Appellant's second point.

### C. Jury Charge Error

In his third point, Appellant contends that the trial court's charge to the jury on punishment contained an incorrect statement of the law regarding the award of good conduct time and parole and, consequently, denied him due process of law under both the state and federal constitutions. The trial court included in its charge the mandatory language of article 37.07, section 4(a) of the Texas Code of Criminal Procedure, informing the jury of the existence and mechanics of the parole laws and good conduct time. TEX.CODE CRIM .PROC. ANN. art. 37.07, § 4(a) (Vernon Supp.2001). Although the instruction tracked the statutory language of article 37.07, Appellant argues that the instruction was incorrect and misleading to the jury because he was ineligible to earn good conduct time toward mandatory supervision release due to the aggravated nature of his offense of conviction.[4] *See id.;* TEX. GOV'T CODE ANN. § 508.149 (Vernon Supp.

---

3.  We note that Appellant's trial counsel stated to the trial court that Davila's testimony would be "somewhat cumulative of that previously given."

4.  The punishment charge given to the jury contained the following instruction:

Under the law applicable in this case, the Defendant, if sentenced to a term of imprison-

2001). Appellant did not object to the charge at trial.[5]

We have previously decided this issue against Appellant's position. *Donoho v. State*, 39 S.W.3d 324, 330–32 (Tex.App.— Fort Worth, 2000, no pet. h.); *Cagle v. State*, 23 S.W.3d 590, 593–94 (Tex.App.— Fort Worth 2000, pet. filed) (op. on reh'g); *see also Espinosa v. State*, 29 S.W.3d 257, 260 (Tex.App.—Houston [14th Dist.] 2000, pet. filed); *Edwards v. State*, 10 S.W.3d 699, 702–03 (Tex.App.—Houston [14th Dist.] 1999, pet. granted); *Luquis v. State*, 997 S.W.2d 442, 443–44 (Tex.App.—Beaumont 1999, pet. granted); *Martinez v. State* 969 S.W.2d 497, 499–501 (Tex.App.— Austin 1998, no pet.); *Garcia v. State*, 911 S.W.2d 866, 869 (Tex.App.—El Paso 1995, no pet.). In *Cagle* and *Donoho*, we determined that inclusion of the mandatory charge under these same or similar circumstances was not error. *See Donoho*, 39 S.W.3d at 330; *Cagle*, 23 S.W.3d at 593– 94.

▆▆▆▆ In addition, as recognized by the Fourteenth Court of Appeals in *Espi-*

*nosa*, Appellant *can* earn time off of his period of incarceration through the award of good conduct time. 29 S.W.3d at 260. There are two statutory means by which an inmate may obtain an early release from the penitentiary—mandatory supervision and parole. *Id.* An inmate's eligibility for release differs significantly under these two systems. *Id.* Mandatory supervision, as the name implies, is a mandatory release program that is calculated according to a simple formula. *Id.* When "the actual calendar time the inmate has served plus any accrued good conduct time equals the term to which the inmate was sentenced," he must be released from the penitentiary under the supervision of the Board of Pardons and Paroles. *See* Tex. Gov't Code Ann. § 508.147 (Vernon 1998). However, certain felons are ineligible for mandatory supervision. *See* Tex.Gov't Code Ann. § 508.149 (Vernon Supp.2001). Where, as here, an inmate has been convicted of sexual assault of a child, he is ineligible for mandatory supervision. *Id.* Appellant is therefore correct in his asser-

---

ment, may earn time off the period of incarceration imposed through the award of good conduct time. Prison authorities may award good conduct time to a prisoner who exhibits good behavior, diligence in carrying out prison work assignments, and attempts at rehabilitation. If a prisoner engages in misconduct, prison authorities may also take away all or part of any good conduct time earned by the prisoner.

It is also possible that the length of time for which the Defendant will be imprisoned might be reduced by the award of parole. Under the law applicable in this case, if the Defendant is sentenced to a term of imprisonment, he will not become eligible for parole until the actual time served equals one-half of the sentence imposed or 30 years, whichever is less, without consideration of any good conduct time he may earn.... Eligibility for parole does not guarantee that parole will be granted.

It cannot accurately be predicted how the parole law and good conduct time might be

applied to this Defendant if he is sentenced to a term of imprisonment, because the application of these laws will depend on decisions made by prison and parole authorities.

You may consider the existence of the parole law and good conduct time. However, you are not to consider the extent to which good conduct time may be awarded to or forfeited by this particular Defendant. You are not to consider the manner in which the parole law may be applied to this particular Defendant.

5. Although Appellant did not raise this complaint in the trial court, we address the issue in light of the court of criminal appeals' discussion in *Jimenez v. State*, 32 S.W.3d 233, 235–39 (Tex.Crim.App.2000), to determine whether fundamental error exists under article 36.19 of the Texas Code of Criminal Procedure. Tex.Code Crim.Proc.Ann. art. 36.19 (Vernon 1981).

tion that he may not earn time off his period of incarceration through the consideration of good conduct time *in the context of mandatory supervision.*

■ However, Appellant fails to entertain the possibility of early release on parole, *with the consideration of good conduct time.* Parole, as distinguished from mandatory supervision, is completely discretionary. *See* Tex.Gov't Code Ann. § 508.001 (Vernon Supp.2001). If eligible, an inmate may be released on parole if the parole panel determines that the inmate's release will not increase the likelihood of harm to the public. *See* Tex.Gov't Code Ann. § 508.141(d) (Vernon 1998). The statutory charge required by section 4(a) of article 37.07 of the code of criminal procedure tracks verbatim section 508.145(d) of the government code, the statute governing eligibility for release on parole, stating that, "[u]nder the law applicable in this case … [the defendant] will not become eligible for parole until the actual time served equals one-half of the sentence imposed or thirty years, whichever is less, without consideration of any good conduct time." Tex.Gov't Code Ann. § 508.145(d) (Vernon Supp.2001); Tex. Code Crim. Proc.Ann. art. 37.07 § 4(a). Hence, after a defendant in Appellant's position has served one-half of the sentence imposed or thirty years, whichever is less, he becomes eligible for early release on parole. Tex.Gov't Code Ann. § 508 .145(d); Tex.Code Crim.Proc.Ann. art. 37.07 § 4(a).

■ When evaluating whether to release an inmate on parole, the parole panel is assisted by guidelines developed by the board. Tex .Gov't Code Ann. § 508.144 (Vernon 1998); *Espinosa,* 29 S.W.3d at 261. The standard parole guidelines include the following factors: (1) current offense or offenses; (2) time served; (3) the risk factors (consideration for public safety); (4) institutional adjustment; (5)

the criminal history; (6) official information supplied by trial officials including victim impact statements; and (7) information in support of parole. 37 Tex.Admin.Code § 145.2(b)(1), (2) (1995), h ttp://info.sos.state.tx.us/pub/plsql/read-tac$ext.ViewtTAC (Title 37, Pt. 5, Ch. 145, Sbch. A, Rule § 145.2(b)(1), (2)); *Espinosa,* 29 S.W.3d at 261. Two of these factors include the accumulation of good conduct time. *Espinosa,* 29 S.W.3d at 261. The accrual of good conduct time is both (1) evidence of an inmate's "institutional adjustment" and (2) information in support of parole. *Id.* In its policy statement relating to parole release decisions, the Board of Pardons and Paroles has explicitly stated:

(1) Other than on initial parole eligibility, the person must not have had a major disciplinary misconduct report in the six-month period prior to the date he is reviewed for parole; which has resulted in loss of good conduct time or reduction to a classification status below that assigned during that person's initial entry into TDCJ ID.

37 Tex.Admin.Code § 145.3(2)(A) (last modified Oct. 29, 2000), *http://info.sos.state.tx.us/pub/plsql/read-tac$ext.ViewTac* (Title 37, Pt. 5, Ch. 145, Sbch. A, Rule § 145.3(2)(A)); *Espinosa,* 29 S.W.3d at 261.

■ From this analysis of the laws applicable to parole, the court in *Espinosa* concluded as follows:

[G]ood conduct time is an important aspect of both mandatory supervision and parole. In the context of mandatory supervision, good conduct time is perhaps a more decisive factor because it is part of the equation used in calculating the release date. Parole, on the other hand, is discretionary and is not computed according to a formula. However, the accumulation of good conduct time is nevertheless an important consideration when deciding whether an inmate should

be released on parole, *i.e.*, if an inmate's misconduct has resulted in the loss of good conduct time, he is ineligible for parole for at least six months.

*Espinosa*, 29 S.W.3d at 261.

Agreeing with the court's convincing analysis in *Espinosa*, we believe Appellant's contention that section 4(a) of article 37.07 contains an incorrect statement of the law regarding good time credit as applied to him does not present error.[6] Through the application of parole, Appellant can earn time off his sentence through the award of good conduct time. Because Appellant may obtain an early release through the imposition of parole after serving half of his sentence or thirty years, whichever is less, and because accrued good conduct time is an important consideration in determining whether an inmate will be paroled, we hold that the instruction contains a correct statement of the law as applied to Appellant, even though he is otherwise ineligible for early release on mandatory supervision. *See Donoho*, 39 S.W.3d at 330; *Cagle*, 23 S.W.3d at 593–94.

Furthermore, the charge as a whole is consistent with our above analysis, in light of the fact that Appellant could possibly gain an early release through the consideration of accrued good conduct time. The jury charge did not mention mandatory supervision, but referred only to good conduct time as a possibility rather than a certainty. Moreover, the jury was instructed that it could not accurately predict how the parole law and good conduct time might be applied to Appellant because the application of those laws would depend upon decisions made by prison and parole authorities. Finally, the jury was told that while it could consider the existence of the parole law and good conduct time, it could not consider the extent to which good conduct time might be awarded to or forfeited by Appellant, nor the manner in which the parole law might be applied to Appellant. Accordingly, we hold that, because the instruction contains a correct statement of the law as applied to Appellant, it was not misleading to the jury and did not deny him due process of law under either the state or federal constitution. *See Donoho*, 39 S.W.3d at 330; *Cagle*, 23 S.W.3d at 593–94. We overrule Appellant's third point.

## IV. CONCLUSION

Having overruled Appellant's points, we affirm the trial court's judgment.

---

6. We also reject Appellant's argument to the extent that it can be read as contending that Appellant and other similarly situated individuals cannot *accrue* good conduct time. Appellant has cited no authority for this proposition, and we can find none. Moreover, section 498.003 of the government code specifically states that the department of corrections *may* grant good conduct time to inmates *regardless of their classification*. TEX. GOV'T CODE ANN. § 498.003(a) (Vernon Supp. 2001).