Bob **AHMADI**, Appellant,

v.

The **STATE** of Texas State.

No. 2–92–155–CR.

Court of Appeals of Texas,
Fort Worth.

Oct. 29, 1993.

Rehearing Overruled Nov. 24, 1993.

Jerry Cobb, Philips & Hopkins, P.C., Denton, for appellant.

D. August Boto, Gainesville, for appellee.

Before FARRIS, LATTIMORE and WEAVER, JJ.

OPINION

LATTIMORE, Justice.

Appellant, Bob Ahmadi, was convicted by a jury for the offense of arson. *See* Tex.Penal Code Ann. § 28.02 (Vernon Supp.1993). The jury further found that a fireman was injured as a result of the fire, thus elevating the offense to a first degree felony, and that the accelerant used to start the fire was a deadly weapon. The jury assessed punishment at life confinement in the Institutional Division of the Texas Department of Criminal Justice and a $10,000 fine. On appeal appellant raises three points of error contending that: (1) the trial court failed to give the proper definition of "reasonable doubt;" (2) the trial court failed to allow the defense attorney to withdraw when timely requested; and (3) the conduct of trial counsel denied the appellant effective assistance of counsel and a fair trial.

We affirm.

Appellant Ahmadi's arson conviction stems from a fire at the Willowick Apartments in Gainesville, Cooke County, Texas, on October 20, 1991. The fire began in a bedroom of apartment number 40, which was occupied by Kim Arnett. Ahmadi had been romantically involved with Kim Arnett for several years, and had a daughter from that relationship. At the time of the fire Ahmadi was a permanent resident of California, but had been visiting with Arnett. Two days before the fire, Ahmadi and Arnett argued, and Arnett subsequently asked Ahmadi to remove himself and his belongings from the apartment. On the morning of the fire, Ahmadi told Arnett that she would be sorry if she made him leave. Ahmadi was seen removing his belongings from the apartment a few hours before the fire began. At about 4:00 p.m., the fire was discovered. One witness testified that he saw Ahmadi run from the apartment after the fire broke out and leave in a

yellow Duster automobile. The license number was recorded by the witness, which led police to Lucy Simpson's home, where Ahmadi was arrested. After receiving consent to search that home, police found clothing belonging to Ahmadi containing keys to Arnett's apartment. Simpson testified that Ahmadi had borrowed the car. Traces of gasoline were found in the burned apartment which matched gasoline found on the floorboard of the Duster. The fire marshall testified that the gasoline was used to intentionally set the fire. Two firemen testified that they were injured as a result of the fire. Ahmadi testified at the trial, and offered an alibi as a defense. The alibi witnesses, however, denied that Ahmadi was with them at the time of the fire.

■ In his first point of error, Ahmadi argues that the trial court failed to give the full definition for "reasonable doubt" set out in *Geesa v. State*, 820 S.W.2d 154, 162 (Tex. Crim.App.1991). The definition actually given to the jury was as follows:

All persons are presumed innocent and no person may be convicted of an offense unless each element of the offense is proved beyond a reasonable doubt. The fact that he has been arrested, confined, or indicted for, or otherwise charged with the offense gives rise to no inference of guilt at his trial. The law does not require a defendant to prove his innocence [or] produce any evidence at all. The presumption of innocence alone is sufficient to acquit the defendant.

This definition omitted the following clause of the *Geesa* definition from the end of the last sentence above:

[U]nless the jurors are satisfied beyond a reasonable doubt of the defendant's guilt after careful and impartial consideration of all the evidence in the case.

*Geesa,* 820 S.W.2d at 162.

While this omission is undoubtedly error, there remains the question whether such error requires reversal. Ahmadi argues that the failure to use the exact *Geesa* definition entitles him to have the case remanded for a new trial, even though he did not object to the definition. The *Geesa* court held that

"this instruction shall be submitted to the jury in all criminal cases, even in the absence of an objection or request by the State or the defendant, whether the evidence be circumstantial or direct." *Id.* The State argues that since Ahmadi did not object to the incomplete definition, reversal is only proper where the error is so egregious that it caused an unfair trial, citing *Almanza v. State*, 686 S.W.2d 157, 171 (Tex.Crim.App.1984). We agree. In *Boozer v. State*, 848 S.W.2d 368, 369 (Tex.App.—Houston [1st Dist.] 1993, pet. ref'd), the court considered exactly the same error, and held that *Geesa* only created an irrebuttable presumption against waiver, and not any presumption of harm. The *Boozer* court further reasoned that the definition that the jury actually received was more favorable to the defendant than the full *Geesa* definition, so that error was not merely harmless, but in fact beneficial to the appellant. *Id.*, 848 S.W.2d at 370. We likewise hold that the error was not harmful, and made no contribution to the conviction or punishment. TEX.R.APP.P. 81(b)(2). Point of error one is overruled.

In his second point of error, Ahmadi argues that the trial court erred in disallowing the withdrawal of Ahmadi's trial attorney, Barrett Keith Brown, two months prior to the trial. In his Motion to Withdraw as Counsel, Brown states that:

Defendant has failed to satisfy the contractual obligations of Defendant in that he has failed and refused to pay said attorney the remaining balance due on that one certain contract dated November 8, 1991.

Defendant has refused to cooperate with attorney, Barrett Keith Brown, in the preparation of a defense for Defendant and has indicated as late as January 31, 1992 that Defendant does not trust said attorney, and in particular does not trust our system of justice in this state or in the United States of America. Defendant further indicated that he is not concerned with the outcome of this case which is set to be tried on February 10, 1992.

Defendant's attorney, Barrett Keith Brown, would show that without the help and cooperation of the Defendant, Bob Ahmadi, said attorney cannot adequately pre-

pare a defense; and, therefore, said attorney respectfully requests that he be allowed to withdraw as attorney representing the Defendant, Bob Ahmadi.

During the pre-trial hearing, the following statements were made:

[DEFENSE COUNSEL:] As far as my motion to withdraw is concerned, I met with Mr. Ahmadi Monday afternoon—or Friday afternoon, I believe, the 30th. The Court had ordered the State's attorney to deliver the discovery to me at 2:00 in the State's office. They did that. Mr. Adams and I met, and Mr. King, for quite some time after that, Your Honor. I then proceeded to the Cooke County Justice Center Jail, informed Mr. Ahmadi of the progress I think that was being made at that time. Mr. Ahmadi informed me that not only did he not trust me but that he didn't trust the entire American system of jurisprudence, and therefore, he was not interested in discussing his case further with me.

I—I made him aware of the plea offer that was extended to me, which is my responsibility, by Mr. Adams. Mr. Ahmadi said that—in so many words that he wasn't concerned with that, that he wasn't concerned with the outcome of these proceedings at all. He was not willing to give the witness list that I had asked him to prepare so that subpoenas could be issued.

I feel like that because of Mr. Ahmadi's attitude toward me—not only toward me, but toward our system, Your Honor, I think that it would be very difficult for me to—to effectively represent Mr. Ahmadi under those circumstances, Your Honor, and that's the reason for the motion to withdraw.

THE COURT: Well, is there any indication to you, Mr. Brown, that he's going to have a different attitude toward any other attorney?

[DEFENSE COUNSEL:] Not at all, Your Honor. Not at all. As a matter of fact, I was conferring with Mr. Ahmadi in the juryroom, and Mr. Ahmadi informed me that—the first words out of his mouth were basically that he wasn't sure whether or not I was on their side or his, and this was kind of a continuance of our conversation on the 30th of January, Your Honor. I'm merely expressing to the Court my concern about this entire—this entire matter. If the Court wishes to me to continue, I certainly will and do everything within my power to protect his rights, Your Honor.

. . . .

THE COURT: Okay.

You understand what's going on here, Mr. Ahmadi? A simple yes or no will do. Either you do understand or you don't understand.

THE DEFENDANT: Part of it I understand, and part of it I do not understand.

THE COURT: Okay. What part do you not understand?

THE DEFENDANT: What I don't understand, whatever I discuss with the attorney, it should stay between attorney and client. It that true or—

. . . .

THE COURT: I've heard all I need to hear about that, Mr. Ahmadi. Go ahead. What else do you not understand?

THE DEFENDANT: What I don't understand? That's what I said. If I discuss with him something, why he's coming since right now, discuss it in the Court with you or with anybody else?

THE COURT: Because it's up to this Court to decide whether or not he can represent you.

. . . .

[THE DEFENDANT]: He never accept my phone call. He never talked to me. I asked him I want to see my record. He didn't show me. He don't talk to me. I don't understand nothing because he never say the word to me. Only I receive—only I receive two letters from him, and that's it.

And the other day, he discuss about the witnesses. I show it to him, the list, and he told me this is all the list you have. I say yes, and he says, I'll be back and I talk to you within next day. He never show up. I call his office every day. He didn't

show up. And I have the witnesses. I call him. He never show up. He never talk to me. He's always ignore me.

. . . .

THE COURT: Okay. Well, I—I'm going to deny the motion to withdraw, but I am going to grant a continuance. And I'll try to make it 60 days, if you think you need that much time, but it may be 30, unless I hear some great objection from the State about granting a continuance?

[PROSECUTOR]: No, Your Honor. We have no objections to the Court granting this continuance.

THE COURT: Mr. Ahmadi, what you need to do is talk to your attorney and talk to him straight.

THE DEFENDANT: He don't talk to me. I'm sorry. How can I? I can't make him talk to me if he don't want to talk to me, and I don't have—I'm not the man to hire an attorney every five minutes, and I don't want him to play games with me.

It is a fundamental principle of due process that, in all criminal proceedings, the accused shall enjoy the option of having the assistance of counsel for his defense. *Gideon v. Wainwright,* 372 U.S. 335, 342–43, 83 S.Ct. 792, 795–96, 9 L.Ed.2d 799, 803–04 (1963); *Ex parte Auten,* 458 S.W.2d 466, 468–69 (Tex.Crim.App.1970, orig. proceeding). This right affords an accused the fair opportunity to secure counsel of his choosing. *Powell v. Alabama,* 287 U.S. 45, 53–54, 53 S.Ct. 55, 58–59, 77 L.Ed. 158, 162–63 (1932). However, the right to obtain counsel of one's own choice is neither unqualified nor absolute. *United States v. Barrentine,* 591 F.2d 1069, 1075 (5th Cir.1979). This right cannot be manipulated so as to obstruct the orderly procedure of the courts and must be balanced with a trial court's need for prompt and efficient administration of justice. *Thompson v. State,* 447 S.W.2d 920, 921 (Tex. Crim.App.1969); *Estrada v. State,* 406 S.W.2d 448, 449 (Tex.Crim.App.1966).

This is not a situation where the defendant rejected court appointed counsel, or where the defendant requested new counsel be substituted or that he be allowed to act pro se. Brown was retained by Ahmadi, and

Ahmadi had not requested new counsel. Rather, it appears that Brown was complaining that his client was not cooperative because he did not believe in the system, and was not current in paying his legal fees. Ahmadi's complaints during the hearing appear to focus on Brown's failure to return all of Ahmadi's phone calls, and on Ahmadi's belief that Brown was revealing confidential information to the prosecution and the court. Based on Ahmadi's statements to the court during the hearing, the trial court could have found that Ahmadi simply did not understand the legal process, and that better communications between attorney and client would solve the problem. Brown stated during the hearing that appointing a new attorney would not solve the problem, and that he was willing to continue as counsel and to "do everything within my power to protect [Ahmadi's] rights." The trial court denied the motion to withdraw, but granted a sixty day continuance, with an instruction to Ahmadi to "talk to your attorney and talk to him straight." No further motions to withdraw were made, and nothing in the record indicates that Brown and Ahmadi failed to cooperate in preparing for trial. We hold that the trial court did not err in denying Brown's Motion to Withdraw. Point of error two is overruled.

In point of error three, Ahmadi complains that the conduct of trial counsel Brown denied him of effective assistance of counsel and a fair trial. Ahmadi lists a number of individual incidents during the voir dire, guilt-innocence, and punishment phases of the trial which he believes are evidence of ineffective assistance. We will consider each in turn, using the appropriate standard.

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction has two components. First, a defendant must show that counsel's performance was deficient; second, a defendant must show that the deficient performance prejudiced the defense. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984). With regard to a defendant's contention that his counsel was not functioning as the "counsel" guaranteed him by the Sixth Amend-

ment of the United States Constitution, judicial scrutiny of counsel's performance must be highly deferential. *Id.* at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. There is a strong presumption that counsel's performance falls within the "wide range of professional assistance," and a defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. *Kimmelman v. Morrison,* 477 U.S. 365, 381, 106 S.Ct. 2574, 2586, 91 L.Ed.2d 305, 323 (1986). The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances. *Id.* *See also Butler v. State,* 716 S.W.2d 48 (Tex.Crim.App.1986). Concerning the second prong of *Strickland,* this requires a showing that counsel's alleged errors were so serious as to deprive a defendant of a fair trial, a trial whose result is reliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. It is not enough for a defendant to show that the errors had some conceivable effect on the outcome of the proceeding, *id.* at 693, 104 S.Ct. at 2067, 80 L.Ed.2d at 697; he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* Basically, the question for our review is whether there is a reasonable probability that absent the alleged errors, the factfinder would have had a reasonable doubt respecting guilt. *See id.* at 695, 104 S.Ct. at 2068–69, 80 L.Ed.2d at 698. In making this determination we must consider the totality of the evidence before the jury, and the ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged. *See id.*

Ahmadi first complains that Brown's failure to discuss Ahmadi's language and comprehension problem on voir dire, when Brown knew that Ahmadi was going to testify, constitutes ineffective assistance, and could not be excused as trial strategy. We disagree. While it is true that Brown could have warned the panel of Ahmadi's language deficiency, and asked if anyone would be prejudiced by this, this remained a judgment call for Brown to make. Brown did discuss Ahmadi's citizenship, his appearance and his foreign sounding name with the apparent goal of determining any bias in the panel, and telling the panel to be impartial despite those facts. Ahmadi points to several occasions where the trial judge admonished Ahmadi to "just answer the question that you're asked" as proof of his language problem, which Brown should have anticipated. Our review of the record indicates that Ahmadi understood the judge, but either was not content to just answer the questions asked, or was attempting to explain the answer fully. Ahmadi further complains that Brown failed to discuss the alibi defense with the jury panel during voir dire. In fact, Brown implied to the panel during voir dire that the reason the grand jury had indicted Ahmadi was because Ahmadi did not have the opportunity to offer an alibi, as he would with that jury. While this could have been explained more fully, we cannot say that a failure to do so was ineffective assistance. On these complaints, Ahmadi has not met his burden under the first prong of *Strickland.*

Ahmadi next complains of Brown's failure to question the validity of the appellant's arrest and file a motion to suppress evidence that may have been recovered as the result of the appellant's alleged illegal arrest. Ahmadi was arrested without a warrant within an hour of when the fire was discovered. The first officers at the scene obtained an eyewitness account of a person identified as Ahmadi running from the scene of the fire and fleeing in a Plymouth Duster registered to Lucy Simpson. By radio, an officer was directed to the vicinity of the Simpson residence to look for the car and Ahmadi. When the officers arrived, Ahmadi left out of the back door of the Simpson residence, and was arrested by police. Ahmadi's car was packed with suitcases. Ahmadi urges that there was no probable cause at the time of the arrest, and Brown should have filed a motion to suppress any evidence obtained as a result of the arrest, since it was illegal. The State urges that the arrest was lawful in that Ahmadi had been identified as

leaving the site of the suspicious fire, and was about to escape when arrested, citing TEX.CODE CRIM.PROC.ANN. art. 14.04 (Vernon 1977). We agree that, under the circumstances, the police could have believed that Ahmadi was attempting to escape, thus warranting an arrest. Furthermore, the evidence obtained from the Simpson residence and property was seized pursuant to a consensual search. Ahmadi had no possessory interest in the Simpson residence, and has no standing to complain of evidence found in the search. Thus, Brown had no basis to make a motion to suppress the evidence used against Ahmadi.

▮▮▮ Ahmadi next argues that he was improperly cross-examined by the prosecutor without objection by defense attorney Brown, and the failure to object allowed prejudicial and inadmissible evidence before the jury. After examining the record, we cannot say that Brown's failure to object to any of the questions cited by Ahmadi was both erroneous and harmful. The questions concerning Ahmadi's birthday, social security number, education and property conveyances were proper in light of his testimony on direct-examination. The most damaging testimony given by Ahmadi on cross-examination was not elicited, but rather voluntary statements outside the scope of the question—something that Ahmadi had been cautioned not to do. Brown did object to several questions, but was overruled by the court.

▮▮▮ Ahmadi complains that Brown failed to object to the prosecutor's use of Ahmadi's post-arrest silence for impeachment purposes. Ahmadi testified on direct-examination about a can of gasoline that he bought and used earlier in the morning on the day of the fire. On cross-examination, the prosecutor asked several additional questions concerning the gasoline, including the following questions:

[PROSECUTOR:] Did you ever tell an officer about the fact that you had a can of gas over at Culberson?

[DEFENDANT:] No one didn't give me chance to explain anything.

[PROSECUTOR:] Never?

[DEFENDANT:] No. . . .

The state argues that Ahmadi opened the door to this question when he testified that he was told "not even a word" at the time of his arrest, and was advised to remain silent. While we believe that the question was objectionable, when viewed in context, the question and answer are not particularly damaging. Brown could have decided not to object as part of a strategy to appear open and completely honest to all questions.

▮▮▮ Ahmadi then argues that Brown failed to interview two alibi witnesses prior to trial, and that this failure amounted to ineffective assistance. On direct-examination, Ahmadi testified that he had been with Donald Pence and Cricket Hobbs at about the time of the fire. Brown then asked Ahmadi the following questions to set up the alibi defense, and to bolster their testimony:

[DEFENSE COUNSEL:] Okay. Do you understand that—that Donald is not in this courtroom, and he hasn't really had the benefit of what you've been telling these ladies and gentlemen under oath, correct?

[DEFENDANT:] Yes, sir.

[DEFENSE COUNSEL:] And we did that for a purpose, didn't we, Bob?

[DEFENDANT:] Yes, sir.

[DEFENSE COUNSEL:] So that when Donald comes in, if his story matches with your, we hope that [the jury is] going to believe everything that you have said, Bob, right?

[DEFENDANT:] Yes, sir.

[DEFENSE COUNSEL:] But if his story doesn't match up with you about the times about going to the police department and about the times about going here and there and doing this and that, then we got a problem, don't we, Bob?

[DEFENDANT]: Yes, sir, but I—you know, time is very complicated because, you know, nobody wants to keep the track of time because, obviously, I didn't know such a tragedy like that is was going to happen.

Brown then called the two alibi witnesses, and made a point of communicating to the jury that they had not been asked any questions or coached in advance, so that the jury

could hear them spontaneously. Unfortunately, this trial tactic did not benefit Ahmadi, because both Hobbs and Pence contradicted Ahmadi on several important points, including the alibi. Ahmadi now argues that the failure to interview the alibi witnesses was ineffective assistance of counsel, citing us to *Ex party Duffy*. It is true that defense "counsel is charged with making an independent investigation of the facts of the case, ... eschewing wholesale reliance in the veracity of his client's version of the facts." *Ex parte Duffy*, 607 S.W.2d 507, 517 (Tex.Crim.App. 1980) (citing *Ex parte Ewing*, 570 S.W.2d 941, 947 (Tex.Crim.App. [Panel Op.] 1978)). "[C]ounsel also has a responsibility to seek out and interview potential witnesses, ... and failure to do so is to be ineffective, if not incompetent, where the consequence is that the only viable defense available to the accused is not advanced." *Id.* (citations omitted). The only defense apparently available to Ahmadi, given the other evidence before the court, was to establish an alibi. Unlike in *Duffy*, here the uninterviewed witnesses *were* put on the stand and the only viable defense *was* advanced. Brown took a calculated risk to sell the alibi to the jury, which failed because Ahmadi's version of the facts was completely unsupported by other witnesses. It is clear from the record that this failure to interview Pence and Hobbs was a conscious decision by Brown to bolster the credibility of his client and the alibi witnesses, and that Brown had discussed the benefits and risks of such failure with Ahmadi before trial. While we do not wish to condone the failure to interview witnesses before trial, we hold that under special circumstances such as these, a failure to interview an alibi witness may be a proper trial strategy. Even if we held that Brown's assistance was ineffective in this instance, the State could have put on these same witnesses to rebut Ahmadi's version of the day's events, making it unlikely that Ahmadi was deprived of a fair trial by the failure to interview these witnesses.

■ Ahmadi next complains the crime scene's specific address was omitted from the application portion of the jury charge, and Brown failed to make an objection. Unnecessary words or allegations in an indictment

may be rejected as surplusage if they are not descriptive of that which is legally essential to the validity of the indictment. *Windham v. State*, 638 S.W.2d 486, 487 (Tex.Crim.App. 1982). The requirements for first degree arson are: (1) defendant started a fire, (2) "with intent to destroy or damage ... any building, habitation, or vehicle," (3) "knowing that it is within the limits of an incorporated city or town," or "knowing that it is located on property belonging to another," or "knowing that it has located within it property to another," and (4) that "bodily injury or death is suffered by any person by reason of the commission of the offense." TEX.PENAL CODE ANN. § 28.02 (Vernon Supp.1993). In addition, the indictment must show that the offense was committed within the jurisdiction of the court (*i.e.*, the county where the offense occurred) and the date of the offense. TEX.CODE CRIM.PROC.ANN. art. 21.02 (Vernon 1989). Both the application paragraph of the court's charge and the indictment contained these essential elements. The inclusion of the address of the apartment building in the indictment is surplusage, and is not necessary to the charge. Thus, an objection would not have been proper, and Brown's performance was not deficient.

■ Next on Ahmadi's list of complaints is Brown's failure to object to alleged numerous instances of improper argument at the guilt-innocence phase of the trial. We have reviewed each of these instances, and agree that some of the argument of the prosecution was improper. In particular, the arguments that the residents, other than Kim Arnett, were afraid of Ahmadi, and that Ahmadi was a "psychopathic person" who was "deranged," were outside the evidence, and could have been objected to by Brown.

Having reviewed the record through the guilt-innocence phase of the trial for any deficiencies by defense trial counsel, we hold that the few instances of deficiency presented were not so serious as to deprive Ahmadi of a fair trial, under the second prong of the test enunciated in *Strickland*.

■ Finally, Ahmadi complains of improper jury argument during the punishment phase of the trial which was not objected to

by Brown. The proper standard to review complaints of ineffective assistance of counsel during the punishment phase of the trial is enunciated in *Ex parte Duffy*, 607 S.W.2d at 516, the standard used before the United States Supreme Court handed down *Strickland v. Washington. See Ex parte Cruz*, 739 S.W.2d 53, 57–58 (Tex.Crim.App.1987). In *Ex parte Duffy*, the court held that effectiveness of counsel was to be judged by the standard of "reasonably effective assistance of counsel." *Ex parte Duffy*, 607 S.W.2d at 516. Under this standard, the sufficiency of an attorney's assistance is gauged by the totality of his representation of the accused. *Ex parte Cruz*, 739 S.W.2d at 58. The constitutional right to counsel does not mean errorless counsel or counsel whose competency is to be judged by hindsight. *Mercado v. State*, 615 S.W.2d 225, 228 (Tex.Crim.App. [Panel Op.] 1981). Generally, an *isolated failure to object* to certain procedural mistakes or improper evidence does not constitute ineffective assistance of counsel. *Ingham v. State*, 679 S.W.2d 503, 509 (Tex.Crim. App.1984). While most of the complained-of statements in the argument were either proper pleas for law enforcement, or a reasonable deduction from the evidence, and thus not objectionable, we do find one statement which should have drawn an objection. That statement, that Ahmadi "subjects all these people ... out there to fear," goes somewhat beyond a reasonable deduction from the evidence. No objection was made, and the question here is whether this isolated failure to object can constitute ineffective assistance of counsel. Viewed in the context of the total representation, we hold that Ahmadi received reasonably effective assistance of counsel. Point of error three is overruled.

The judgment of the trial court is affirmed.